## UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA | Civil No. 09-3737 (JRT/LIB) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER ON CROSS SUMMARY JUDGMENT MOTIONS** |
| RUSS HUSEBY AND BRADY HUSEBY, | |
| Defendants. | |

Ana H. Voss, Assistant United States Attorney, **UNITED STATES ATTORNEY'S OFFICE**, 600 United States Courthouse, 300 South Fourth Street, Minneapolis, MN 55415; Molly A. McKegney, Assistant District Counsel, **US ARMY CORPS OF ENGINEERS – SAINT PAUL DISTRICT**, 180 Fifth Street East, Suite 700, Saint Paul, MN 55101, for plaintiff;

R. Thomas Torgerson, **HANFT FRIDE PA**, 130 West Superior Street, Suite 1000, Duluth, MN 55802; Patrick S. Dinneen, 5554 Highway 61, Silver Bay, MN 55614, for defendants.

The United States sued Russ Huseby and his son, Brady Huseby, for logging and land clearing in violation of the Clean Water Act ("CWA"). The United States asserts that the Husebys' non-permitted clearing discharged pollutants into waters of the United States. The United States moved for summary judgment on the issue of Russ Huseby's liability and is seeking a restoration order and civil penalty. Russ Huseby also moved for summary judgment on the issue of his liability, arguing that his activities were exempt from the CWA. The Husebys moved for summary judgment on the issue of Brady

Huseby's liability, asserting that Brady Huseby did not perform any of the alleged acts. Because the Court finds that Russ Huseby's activities fall within the recapture provision of the CWA, the Court grants summary judgment to the United States on the issue of Russ Huseby's liability. Because the Court finds that the United States has failed to demonstrate a prima facie case against Brady Huseby, the Court grants the Husebys' motion for summary judgment with respect to Brady Huseby's liability. The Court denies the United States' motion for a restoration order and a civil penalty and will hold an additional hearing to address these questions.

## BACKGROUND

### I.   THE SITE

The land at issue is located within an 80 acre area in Lake County, Minnesota ("the site"). (Ana H. Voss Decl., Aug. 1, 2011, Ex. 2, Huseby Dep. at 95: 11-17, Jan. 5, 2011, Docket No. 57.) The site consists of two 40 acre parcels. (*Id.*) Russ Huseby ("Huseby") purchased the northern 40 acres in 1991 and the southern 40 acres in 1999. (*Id.*) Within the site are two areas subject to dispute: the Northern Area and the central eastern southern area ("CES area"). (Steve D. Eggers Decl., July 21, 2011, Expert Report § 3.1 & Fig. 2, Docket No. 54.) The site borders Fortythree Creek. (Voss Decl., Ex. 1, Defs.' Second Supp. Resp. Req. Admis. No. 8, Docket No. 57.)



Huseby and his wife quitclaimed 10 acres of the Northern Area to Brady Huseby in February 2007.  (*Id.* No. 3.)  In September 2008, Huseby and his wife sold 20 acres of the site to Daniel J. Enebo and Laura H. Crosby.  (Defs.' Second Supp. Resp.  Req.

Admis. No. 5.)   In June 2010, Huseby listed for sale the remaining land on the site. (Huseby Dep. at 37:13-24.)   In December 2010, Huseby and his wife sold 10 acres of the Northern Area (including a house that had been constructed there) and 20 acres of the CES Area to Dallas Dean for $250,000.   (*Id.* at 39:15, 50:18-20, 51:18-20; Russ Huseby Aff. ¶ 16, Aug. 1, 2011, Docket No. 58.)   In sum, of the original 80 acres, Huseby has transferred 60 acres and retains 20 acres of the site; his son, Brady ("Brady Huseby"), still owns 10 acres.

## II.    HISTORY OF THE SITE

At the time Huseby purchased the site, it was undeveloped forest.   (Huseby Aff. ¶ 7.)   Huseby asserts that the land "had a history of silviculture[1] activities that date back to a century ago."   (*Id.*)   Specifically, Huseby claims that the land was logged in the early 1900s and in the 1960s or 1970s.   (Huseby Dep. at 187:24-188:5.)   To support his assertion, Huseby notes his abstract of title states that the rights to the pine timber on the site were transferred in 1902.   (Torgerson Aff., Aug. 1, 2011, Ex. D, Docket No. 59.) Huseby testified in his deposition that the size of the trees indicated the land had been logged again in the 1960s or 1970s.   (Huseby Dep. at 188:21-22.)   Huseby also asserts that he talked to a man who helped log the land as a child.   (*Id.* at 100:24-101:5, 190:21-191:12.)

---

[1] The Oxford English Dictionary defines silviculture as: "The cultivation of woods or

### III.    RUSS HUSEBY'S CLEARING AND DEVELOPMENT OF THE SITE

### A.    Roads

Beginning in 2000, Huseby reestablished old logging roads and put in new logging roads in the Northern Area.  (Huseby Dep. at 98:20-99:8, 116:9-11.)  Huseby also built new logging roads[2] in the CES Area.  (Huseby Dep. at 114:2-10, 123:1-17.)  The parties dispute whether Huseby followed best management practices ("BMPs") in constructing and maintaining the roads.  *See* 33 C.F.R. § 323.4(6) (defining BMPs for forest roads).

### B.    Logging & Clearing

Huseby began logging the site in 2000 and completed logging by 2007.  (Huseby Dep. at 110:16-18, 117:1-2, 256:15-22.)   Huseby admits he cleared his land "completely," taking out all of the trees.  (*Id.* at 120: 13-17.)  In addition, many stumps were removed.  (*Id.* at 151:25-154:4.)

After removing the trees from the site, Huseby raked the brush into piles using a brush rake attached to the front of a bulldozer.  (*Id.* at 153:2-154:20.)  He burned the piles of brush and disked[3] the area to mix the ash into the soil.  (*Id.* at 154:21-156:23.)  Huseby intended to replant the area with red pine although he admits no red pine trees grew on

---

[2] In his briefing, Huseby asserts these paths are "skid trails," which are narrower than forest roads and are used to drag timber to a staging area; however, in his deposition, Huseby also referred to the paths as "roads."  (Defs.s Mem. Supp. Summ. J. at 5; Huseby Dep. at 114:2-10.)

[3] A disk is a tool for site prepping; it is dragged over land to break up clumps and remove weeds.  (*See*  Huseby Dep. at 155:21-156:10.)

the site before he began logging.  (*Id.* at 157:12-25.)  Only a few trees were planted.  (*Id.* at 157:6-13.)

The U.S. Army Corps of Engineers ("Corps") found that between 2003 and 2009 twenty-eight acres of the site were converted from a wetland dominated by woody vegetation to exposed soils.  (Expert Report §§ 3.5, 7.1.)  *See* Part V, *infra*.  Huseby asserts he harvested the timber using BMPs and readied the site for future logging by preparing it for replanting and regeneration.

## IV.    ENFORCEMENT ACTIONS

Both Lake County, Minnesota and the Corps have undertaken evaluations of the site and subsequent enforcement actions against Huseby.   Huseby asserts that no violation ever existed because his activities were exempt from the permit requirement of the CWA.  The United States asserts that both Lake County and the Corps repeatedly determined a permit was required.

In 2006 and 2007, Huseby sought – and was denied – a wetlands exemption from Lake County.  (Compl. ¶¶ 66-70, Docket No. 1; Answer ¶ 12, Docket No. 2.)  In October 2007, the County prepared a violation report which found seven to ten acres of wetlands on the site had been filled, logged, or graded, resulting in "wetland violations" (Voss Decl., Ex. 8, Violation Report, Docket No. 57.)[4]   In 2008, the County issued a

---

[4] Huseby argues this Exhibit is hearsay not within any exception. The United States asserts this is a self-authenticating record admissible under FRE 803(8).  The Court concludes the letter is admissible under FRE 803(8).

Restoration Order and ordered Huseby to complete the restoration of the site by July 31, 2008.  (Voss Decl., Ex. 9, Restoration Order, Docket No. 57.)  In September 2008, after a site visit, the County reported multiple violations of the CWA[5] and several instances of non-compliance with the Restoration Order.[6]  (Voss Decl., Ex. 11, Summ. of Huseby Wetland Restoration Site Visit, Docket No. 57.)

In response to a report of a CWA violation by Lake County, the Corps sent Huseby a notice of violation ("NOV") on January 3, 2005.  (Voss Decl., Ex. 4, Docket No. 57.)  The NOV noted that fill had been discharged into wetlands on his property and advised Huseby not to perform any additional work that required a permit without authorization.  (*Id.*)  Huseby responded verbally, asserting that his work fell within an exception to the CWA and he did not need a permit.  (Compl. ¶ 60; Answer ¶ 12; Huseby Aff. ¶ 19.)  The Corps sent a follow-up letter to Huseby on January 7, 2005, acknowledging his verbal response and requesting more information, including a site plan, within 30 days.  (Voss Decl., Ex. 5, Docket No. 57.)  Huseby never responded to the January 7, 2005 letter.  (Compl. ¶ 63; Answer ¶ 12 (admitting).)

On October 25, 2006, the Corps and Minnesota Department of Natural Resources personnel completed a site investigation.  (Compl. ¶ 64; Answer ¶ 12.)  Corps personnel

---

[5] For example, the County officials recorded that one "entire wetland impact area had been leveled" and no BMPs were observed.  (Summ. of Huseby Wetland Restoration Site Visit.)

[6] For example, required seeding and planting had not been started in multiple areas; some of the roads had not been restored and one was still being actively used; and ditches had not been filled in. (Summ. of Huseby Wetland Restoration Site Visit.)

found "dredged and fill material had been discharged in wetlands for the construction of access roads and grading of a pasture area."   (Compl. ¶ 64; Answer ¶ 12.)   On November 22, 2006 and October 1, 2009, the Corps sent additional NOVs to Huseby alleging unpermitted discharge of fill material into wetlands in violation of the CWA. (Compl. ¶¶ 64, 67, 86; Answer ¶ 12.)   In response to what it believed to be ongoing violations, the Corps initiated litigation and a more thorough site investigation in 2009. (*See* Compl. ¶¶ 79-85, 88.)

## V.   WETLAND DELINEATION OF THE SITE

In order to officially delineate which areas of the site are wetlands, the Corps performed site inspections in 2009 and 2010.  (Defs.' Second Supp. Resp.  Req. Admis. No. 30.)  The Corps team that performed the inspections used these site visits and aerial photography records to produce the Expert Report in October 2010.  (Eggers Decl. ¶¶ 5-6; Expert Report.)   The Corps team was made up of Benjamin Cox, Steve Eggers, and Gregory Larsen.   (Expert Report § 1.0.)   Cox is an Enforcement and Compliance Specialist for the Corps.  (Benjamin R. Cox. Decl. ¶ 3, July 26, 2011, Docket No. 56.) Eggers is a 33-year employee of the Corps, a certified Professional Wetland Scientist, and an expert on the CWA.  (Eggers Decl. ¶ 3.)  Larsen is a Senior Ecologist and Soil Scientist for the Corps with 20 years of experience in wetland management.  (Gregory A. Larson Decl. ¶ 3, Aug. 1, 2011, Docket No. 55.)   All three men are trained to make wetland delineations.  (Cox. Decl. ¶ 3; Eggers Decl. ¶ 3; Larson Decl. ¶ 3.)

The Corps defines wetlands as "those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions." 33 C.F.R. § 328.3(b). The Corps uses *The Corps of Engineers Wetlands Delineation Manual* ("*1987 Manual*") as guidance when making wetland delineations. (Expert Report § 4.2.) An up-to-date regional supplement was used by the Corps team when observing the site. (*Id.*)

Using aerial photography, reference areas, and direct observations, the Corps determined that "a large portion of the site was wetland prior to activities undertaken at the site." (*Id.* § 8.0.) Due to this determination, the Corps found it has jurisdiction over the wetlands on the site under the CWA. (*Id.* § 7.2.) *See infra* Part II.A.1.

Huseby asserts that the Corps' wetland delineation is unreliable because the Corps was required but failed to follow the "Comprehensive Guidelines" in the *1987 Manual*. "The comprehensive approach requires application of quantitative procedures for making wetland determinations." (Second Aff. of R. Thomas Torgerson, Aug. 22, 2011, Ex. A, *1987 Manual* at 7, Docket No. 67.) The manual notes the comprehensive approach "should seldom be necessary, and its use should be restricted to situations in which the wetland is very complex and/or is the subject of likely or pending litigation." (*Id.* at 7-8.)

## VI.    BRADY HUSEBY

Brady Huseby lived on the site until 2006. (Torgerson Aff., Ex. J., Brady Huseby Dep. at 4:17-25, Docket No. 59.) He is a general contractor and now lives in Duluth. (*Id.*

at 4:8-9, 5: 3-4.)  Brady Huseby denies doing any work on the site but admits he helped to build houses on the site.  (*Id.* at 11:12 to 13:25.)

During a site inspection in 2009, Benjamin Cox had a conversation with Russ Huseby regarding work that occurred on the site.  (Cox. Decl. ¶ 22.)  Cox asserts Russ Huseby told him Brady Huseby "had done work in the eastern side of the northern area of the site."  (*Id.*)

## ANALYSIS

### I.    STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from those facts.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### II.   CROSS MOTIONS FOR SUMMARY JUDGMENT ON RUSS HUSEBY'S CWA LIABILITY

The parties have each moved for summary judgment on the issue of Huseby's liability under the CWA.  The CWA prohibits the unauthorized discharge of any dredged

or fill material into "navigable waters." *See* 13 U.S.C. §§ 1311,[7] 1344,[8] 1362(12);[9] 33 C.F.R. § 323.4.  The United States bears the burden of making a prima facie case that Huseby violated the CWA. *See United States v. Cundiff*, 555 F.3d 200, 213 (6th Cir. 2009).  Huseby bears the burden of demonstrating an exception to the CWA applies **and** his activities did not fall within the CWA's recapture provision, reinstating the need for a permit. *See United States v. Brace*, 41 F.3d 117, 124 (3d Cir. 1994).  The Court will grant summary judgment to the United States because the United States has made a prima facie case that Huseby violated the CWA and Huseby has failed to demonstrate his activities do not fall within the recapture provision.

### A.       The United States' Prima Facie Case

To establish a CWA violation under the 33 U.S.C. § 1311, the United States must prove Huseby is a person who discharged a pollutant, from a point source, into navigable waters, without authorization under 33 U.S.C. § 1344. *See Cundiff*, 555 F.3d at 213 (noting elements and burden).  The parties do not dispute that Huseby is a person within the meaning of the CWA; that Huseby discharged **some** fill material,[10] a pollutant, from a

---

[7] CWA § 301.

[8] CWA § 404.

[9] CWA § 502(12).

[10] Although Huseby contests the **amount** of fill, he does not contest that fill was moved onto the site to construct roads.  (*See, e.g.*, Huseby Dep. at 167:18-168:9.)

point source;[11] or that Huseby did not have authorization in the form of a permit from the Corps. Huseby contests whether the site was properly delineated as a wetland and, thus, whether he discharged pollutants into navigable waters within the meaning of the CWA.

### 1.    Wetlands' Nexus to Navigable Waters.

The United States must demonstrate that the wetlands on the site are within the Corps' CWA jurisdiction. The CWA prohibits the discharge of any pollutant from any point source into "navigable waters." *See* 33 U.S.C. §§ 1311(a), 1344. Navigable waters are defined by the CWA as the "waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7). Under the Corps' regulations, navigable waters include waters that are navigable-in-fact and wetlands adjacent to navigable-in-fact waters. 33 C.F.R. § 328.3(a)(1), (7). The Eighth Circuit held that the Corps has jurisdiction over wetlands that (1) have a "continuous surface connection" to navigable-in-fact waters or (2) possess "a significant nexus to waters that are or were navigable in fact or that could reasonably be so made." *United States v. Bailey*, 571 F.3d 791, 797-99 (quoting *United States v. Rapanos*, 547 U.S. 715, 742, 759 (2006)). A wetland has the "requisite nexus" if it "either alone or in combination with similarly situated lands in the region, significantly affect[s] the chemical, physical, and biological integrity of the covered

---

[11] A point source is defined as "any discernible, confined and discrete conveyance . . . from which pollutants are or may be discharged." 33 U.S.C. § 1362(14). Case law has held a point source may be a piece of equipment such as a bulldozer or disking equipment, *see Avoyelles Sportsmen's League v. Alexander*, 473 F. Supp. 525, 532 (W.D. La. 1979), both of which Huseby admits to using on the site. (*See, e.g.*, Defs.' Second Supp. Resp. Req. Admis. at Nos. 56, 87, 114.)

waters more readily understood as 'navigable.'" *Id.* at 798 (quoting *Rapanos*, 547 U.S. at 780).

The Corps found that (1) the wetlands on the site have a continuous surface connection with Lake Superior, a traditionally navigable water, and (2) the wetlands possess the requisite nexus to navigable-in-fact waters because the site's wetlands, in combination with similarly situated wetlands, "significantly affect the chemical, physical, and biological integrity" of Lake Superior.  (*See* Expert Report § 7.2.)  Huseby presented no evidence to dispute that the Corps has jurisdiction under the CWA for wetlands on the site.  The Court concludes any wetlands on the site are within the jurisdiction of the Corps.

### 2.      Wetland Delineation

At the heart of this dispute is whether the wetlands on the site were properly delineated.  In its Expert Report, the Corps reported its determination that "a large portion of the site was wetland prior to activities undertaken at the site."  (Expert Report § 8.0.) The Expert Report provides extensive documentation of the site inspections, including aerial photography, direct observations of reference areas (including photographs), precipitation data, and wetland determination forms.  (*See generally* Expert Report.) Huseby argues that the Corps' determination is incorrect because the Corps did not follow required procedures in producing the report and the report is inconsistent with other government reports and his own observations.  Huseby also disputes the Expert Report because it claims he used a "rock rake" and graded and leveled the property (*see*

Expert Report § 7.1), which he denies.   The Court finds that the United States has demonstrated the site contains wetlands and Huseby has failed to present any evidence that would convince a reasonable fact finder the site did not contain wetlands.

### a.   Failure to Follow Comprehensive Guidelines

Huseby asserts that the Corps' determination is incorrect because it did not follow required procedures in producing the report.   Specifically, Huseby claims that the Corps should have followed the comprehensive guidelines in the *1987 Manual*.   Huseby has not produced an expert to suggest the comprehensive guidelines should have been followed or that the routine guidelines resulted in an unreliable determination.   In contrast, Eggers testified that a comprehensive determination is not required, was not indicated here, and would not have provided the Corps with additional useful information.   (Steve D. Eggers Third Decl. ¶¶ 3-4.)   Moreover, the *1987 Manual* states that the comprehensive guidelines should be used sparingly and that both types of determination "have been tested and found to be reliable."   (*1987 Manual* at 8.)

Similarly, in *Bailey,* the Eighth Circuit noted that the landowner had presented no evidence that a particular evaluation mode should be used, and the Corps' expert[12] testified that the use of that test would be inappropriate.   571 F.3d at 802.   The court held that in the absence of expert or competent evidence to rebut the Corps' determination, the Corps' wetlands determination could not be disregarded.   *Id.*   Because Huseby has not provided specific facts or expert evidence to rebut the Corps' determination that its

---

[12] In *Bailey*, as in this case, one of the experts was Steve Eggers.   571 F.3d at 801.

methods correctly delineated the wetlands, the Court finds the Corps' delineation of the wetlands is accurate.

### b.   Inconsistencies with Other Reports and Observations

Huseby next argues that the Corps' determination is incorrect because it is inconsistent with the County's Restoration Order's findings of fact regarding the extent of damage, the Corps' 2008 National Wetlands Inventory Aerial Wetland Delineation, and his own observations.

Lake County's Restoration Order stated that a "determination was made that approximately 7-10 acres of wetlands were impacted by mechanized land clearing and approximately 19,500 square feet of wetlands were impacted by fill for roads."  (Voss Decl., Ex. 9, Docket No. 57.)  In contrast, the Expert Report found that "approximately 28 acres of wetlands" were impacted by unauthorized activities on the site.  (Expert Report § 7.1.)  The United States asserts that the Restoration Order was based on a "limited review of preliminary information" whereas the Corps "looks at all impacts . . . of the work." (Pl.'s Reply Mem. Supp. Summ. J. at 3, Docket No. 60.)[13]  Furthermore, in its Violation Report, the County noted that it attempted to make multiple visits to the site and Huseby denied access to the property or was unresponsive.  (Violation Report at 3.) The evaluation that was finally done required a search warrant.  (*Id.*)  Even the Corps

---

[13] The United States also asserts that the Restoration Order was released "before all work on the Site had been completed."  (Pl.'s Reply Mem. Supp. Summ. J. at 3, Docket No. 60.) However, the Restoration Order was issued in March of 2008, when Huseby asserts all the work had been completed.

encountered site access restrictions imposed by Huseby in doing the testing required for its Expert Report.  (Expert Report at 19 n.16.)

Huseby also claims that the Corps' 2008 National Wetlands Inventory Aerial Wetland Delineation (Huseby Dep., Ex. 11; Expert Report Fig. 3) conflicts with the Expert Report.  However, the National Wetlands Inventory was based on less data than the Expert Report and occurred **after** Huseby had performed his work on the site. A finding that minimal wetlands were left on the site in 2008 is consistent with the Expert Report's finding that "a large portion of the site was wetland **prior** to activities undertaken at the site." (Expert Report § 8.0 (emphasis added).)

Finally, Huseby asserts that the wetland determinations in the Expert Report are inconsistent with his own observations.  However, Huseby has not read the *1987 Manual* and has not been trained in wetland delineation.  (*See* Huseby Dep. at 187:5-12.)  Huseby has failed to produce any other expert opinion or wetland delineation.

The Court finds that the conflicts between the state's Restoration Order, the Corps' Aerial Wetland Delineation, and the Expert Report do not create an issue of material fact because the Expert Report is so clearly based on more thorough information.

### c.      Factual Disputes within the Expert Report

Huseby argues that the Expert Report is disputed with respect to the means used to clear vegetation from the site.  The Expert Report states that Huseby used a rock rake and leveled the site using a bulldozer.  (Expert Report § 7.1.)  Huseby denies grading or leveling the property or using a bulldozer blade for anything other than construction.

(*See, e.g.*, Huseby Dep. at 166:11-19.)  However, even if Huseby did not use a rock rake or a grader, there is no genuine issue of material fact regarding that he discharged fill material from a point source.  In sum, the Court finds that (1) the United States has demonstrated a sufficient prima facie case that Huseby violated the CWA and (2) that Huseby failed to create a genuine issue of material fact that the Expert Report's wetland delineation is inaccurate.

### B.    The Silviculture Exception

Huseby asserts that even if he did discharge fill into a wetland without a permit he did not violate the CWA because he falls within an exception to the permit requirement. 33 U.S.C. § 1344(f)(1).  It is Huseby who must demonstrate that he falls within an exception to the CWA.  *See United States v. Brace*, 41 F.3d 117, 124 (3d Cir. 1994).[14]

The CWA exempts from the permit requirement the discharge of fill material associated with (1) normal silviculture activities or (2) the construction or maintenance of forest roads in accordance with BMPs.  33 U.S.C. § 1344(f)(1)(A) & (E).  In order to be exempt under § 1344(f), a party must show not only that its activities are exempt under one of the provisions of § 1344(f)(1) but also that its activities do not fall within the recapture provision, § 1344(f)(2).  *Greenfield Mills, Inc. v. Macklin*, 361 F.3d 934, 949 (7th Cir. 2004).  If a party's activities fall within the recapture provision, a permit is

---

[14]    Huseby suggests in his briefing that the United States bears the burden of demonstrating the exception does not apply.  (*See* Defs.' Mem. Supp. Summ. J. at 31.)  This is incorrect.  *See Brace*, 41 F.3d at 129.

required.   33 U.S.C. § 1344(f)(2).   The Court finds that although Huseby has created a dispute of material fact as to whether his activities fall within the § 1344(f)(1) exceptions, there is no question that his activities are recaptured by § 1344(f)(2).

### 1.   Entitlement to Exception

Huseby contends his activities fall within either the § 1344(f)(1)(A) exemption for normal silviculture or the § 1344(f)(1)(E) exemption for the construction and maintenance of forest roads.   The § 1344(f)(1) exemptions are construed narrowly. *United States v. Akers*, 785 F.2d 814, 819 (9th Cir. 1986).[15]   The Court finds that Huseby has created a material fact dispute about the whether these exceptions apply.

### a.   Normal Silviculture

Section 1344(f)(1)(A) exempts from the CWA permit requirement "normal . . . silviculture . . . such as . . . harvesting for the production of . . . fiber, and forest products . . . ."   In order to fall within this exception, the activities

> must be part of an established (i.e., on-going) . . . silviculture . . . operation
> . . . .   Activities which bring an area into . . . silviculture. . . use are not part
> of an established operation.   An operation ceases to be established when the
> area on which it was conducted has been converted to another use or has
> lain idle so long that modifications to the hydrological regime are necessary
> to resume operations.

33 C.F.R. § 323.4(a)(1)(ii).

---

[15]   The Fifth and Seventh Circuits have also construed the exemptions narrowly. *Avoyelles Sportsmen's League v. Marsh*, 715 F.2d 897, 925 n.44 (5th Cir. 1983); *United States v. Huebner*, 752 F.2d 1235, 1240-41 (7th Cir. 1985).

Huseby contends that any work he did on the site falls within this exception because the site was logged in the past.  In support of his argument that the site was logged previously, Huseby points to an early transfer of timber rights, the size of the trees, and his conversation with a man who had logged the land.

Other courts have interpreted "on-going" silviculture to require "efforts to regenerate and reestablish the forest." *Ogeechee-Canoochee Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 559 F. Supp. 2d 1336, 1344 (S.D. Ga. 2008) ("To constitute past silviculture, there must also be evidence of past efforts to regenerate the forest or evidence that the standing forest is a product of someone's past endeavors."); *Bayou Marcus Livestock and Agric. Co. v. U.S. Envtl. Agency*, No. 88-30275, 20 E.L.R. 20445 (N.D. Fla. Nov. 3, 1989).  Huseby asserts that evidence of natural regeneration of the forest is sufficient to demonstrate silviculture and that earlier loggers left immature trees to grow with the expectation that the land would be logged again.  (*See* Huseby Dep. at 255:9-24.)  Although land undergoing natural regeneration must have "lain idle," it is possible that further logging could be done without modification to the land's hydrological regime.  *See* 33 C.F.R. § 323.4(a)(1)(ii).  Construing all of the facts in favor of Huseby, the Court concludes he has created factual dispute as to whether his activities should be exempt under the ongoing silviculture exception.

b.      **Construction of Forest Roads**

Huseby also argues that any discharges that did occur were made in connection with the construction or maintenance of logging roads and are thereby exempt from the permit requirement.  Section 1344(f)(1)(E) exempts from the permit requirement

> construction or maintenance of  . . . forest roads . . . where such roads are constructed and maintained, **in accordance with best management practices**, to assure that the flow and circulation patterns and chemical and biological characteristics of the navigable waters are not impaired, that the reach of the navigable waters is not reduced, and that any adverse effect on the aquatic environment will be otherwise minimized.

33 U.S.C. 1344(f)(1)(E) (emphasis added).  The roads must not prevent the flow of water and only necessary roads may be constructed.  33 C.F.R. § 323.4(a)(6).

Corps regulations require the roads to be "bridged, culverted,[16] or otherwise designed to prevent the restriction of expected flood flows."  33 C.F.R. § 323.4(a)(6)(iii).  The parties dispute which BMPs apply and what size culverts Huseby was required to install.  The parties also dispute whether flooding in neighboring areas was the result of Huseby's activities.  Taking all the facts in the light most favorable to Huseby, the Court finds there is a factual dispute regarding whether Huseby "designed [the road] to prevent the restriction of expected flood flows" as required by the Corps.  33 C.F.R. § 323.4(a)(6)(iii).

Corps regulations also require that the "fill shall be properly stabilized and maintained during and following construction to prevent erosion."  33 C.F.R.

---

[16] A culvert is a structure that conveys water under a road.

§ 353.4(a)(6)(iv).  The parties dispute which BMPs apply and whether Huseby was required to use a silt fence (or if other methods to prevent the release of sediment were adequate).[17]  Taking all the facts in a light most favorable to Huseby, a reasonable jury could find that he adequately stabilized the fill to prevent erosion in constructing the roads on the site.

The Corps' regulations also require that the construction of logging roads be minimized.  "Permanent roads (for farming or forestry activities), temporary access roads (for mining, forestry, or farm purposes) and skid trails (for logging) . . . shall be held to the minimum feasible number, width, and total length consistent with the purpose . . . ."  33 C.F.R. § 353.4(a)(6)(i).  The parties dispute whether the roads were of minimal length and number for the type of work performed.  The Court concludes that Huseby has created a factual dispute regarding his use of BMPs in creating and maintaining the roads and trails through the site; therefore, he could be entitled to the forest roads exemption – if the recapture provision is inapplicable.

## 2. Applicability of the Recapture Provision

Without deciding whether the work performed by Huseby was exempt under § 1344(f)(1), the Court must analyze whether Huseby has established that his activities do not fall within the recapture provision, § 1344(f)(2).  *See Greenfield Mills*, 361 F.3d at

---

[17] Huseby asserts he "complied with [the Guidelines'] recommendation by locating the roads perpendicular to the waterway (thereby minimizing sediment exposure to the waterway) and by utilizing cloth under the gravel" on the roads.  (Defs.' Mem. Opp. Mot. Summ. J. at 21, Docket No. 66.)

949, 953.  Section 1344(f)(2) reinstates the permit requirement where the discharge into water is "[1] incidental to any activity having as its purpose bringing an area of the navigable waters into a use to which it was not previously subject, [and 2] where the flow or circulation of navigable waters may be impaired or the reach of such waters reduced . . . ."  To fall within the exception, both conditions must be shown to apply.  *See, e.g.*, *Greenfield Mills*, 361 F.3d at 954.  Huseby asserts that the recapture provision does not apply because the site was previously logged so additional logging did not introduce a new use, nor have his activities impaired the flow of navigable waters.

Although the site may have been previously logged, Huseby has presented no evidence that it was previously clear cut or that it was previously prepared for replanting or replanted.  Transforming the site into a red pine plantation as Huseby intended (Huseby Dep. at 255:24-256:2) would be bringing the site into a new use.  Huseby admits that no red pine grew on the land prior to logging.  (Huseby Dep. at 157:24-25.)  Red pine is a non-wetland tree species and is absent from the hardwood swamps, conifer swamps, and alder thickets that were found on the wetlands of the site prior to Huseby's activities.  (Steve D. Eggers Second Decl. ¶¶ 4-5, Aug. 12, 2011, Docket No. 63.)[18] Huseby also admits that by preparing the land to be a red pine plantation he was "trying to achieve a different goal" than letting the trees naturally regenerate.  (Huseby Dep. at 255:20-256:2.)  Similarly, in *Akers*, the court held that converting a wetland to an area

---

[18] "[S]uccessful establishment of a red pine plantation on the Huseby site would require conversion of wetlands to dryland via draining and/or filling the site."  (Eggers Second Decl. ¶ 5.)

where upland crops are grown was a new use under § 1344(f)(2).  785 F.2d at 822.  In *Bayou Marcus*, the court held that even if loggers' activities were ongoing silviculture under § 1344(f)(1), "such operation was limited to selective harvesting of natural growth," and the development of "an additional activity" such as tree farming did not fall within the § 1344(f)(2) exemption.  20 E.L.R. at 20446.  Because Huseby developed the site with the intent of establishing a red pine plantation, the Court concludes his acts were clearly done with the purpose of bringing the site into a new use.

Huseby also argues that he did not impair the flow of navigable waters.  Huseby's assertion directly contradicts the Corps' finding that his "mechanized land clearing" discharged fill material into wetlands with "both a continuous surface connection with Fortythree Creek, a relatively permanent water and part of the Lake Superior tributary system, and a significant nexus to the chemical, physical, and biological integrity of Lake Superior, a traditionally navigable water."  (Expert Report § 8.0.)  As discussed above,[19] Huseby has not presented sufficient evidence to create a genuine issue of material fact that he did not alter the character of the wetlands and reduce their reach.

The Court finds that even if Huseby could demonstrate that one of the exceptions of § 1344(f)(1) applies, he is unable to demonstrate the recapture provision does not apply, and he was therefore required to obtain a permit.  The Court will grant the United States' motion for summary judgment as to Huseby's liability because the United States

---

[19] See Part II.A, *supra*.

has demonstrated a prima facie case and Huseby has failed to demonstrate the recapture provision does not apply.

## III.   THE HUSEBYS' MOTION FOR SUMMARY JUDGMENT ON BRADY HUSEBY'S LIABILITY

The Husebys move for summary judgment on the issue of Brady Huseby's liability asserting he did not perform any of the alleged acts.  To establish a CWA violation under the 33 U.S.C. § 1311, the United States must prove Brady Huseby is a person who discharged a pollutant, from a point source, into navigable waters, without authorization under 33 U.S.C. § 1344.  A person under the meaning of the CWA may be either an individual "who actually performed the work" or "the party with responsibility for or control over performance of the work."  *United States v. Lambert*, 915 F. Supp. 797, 802-803 (S.D.W.Va. 1996).

Brady Huseby denies doing any work on the site.  (Brady Huseby Dep. at 11:12 to 13:25.)  He does admit he helped to build houses on the site.  (*Id.* at 11:15-21.) Moreover, Cox asserts that Russ Huseby told him Brady Huseby "had done work in the eastern side of the northern area of the site."  (Cox. Decl. ¶ 22.)  The United States presented no evidence regarding the type of work Brady Huseby did or that it resulted in the discharge of a pollutant.  The Court concludes that the United States has failed to create a genuine issue of material fact regarding Brady Huseby's liability, and the Husebys' motion with respect to Brady Huseby's liability will be granted.

## IV.     UNITED STATES' MOTION ON ITS ENTITLEMENT TO REMEDIES

The United States seeks relief in the form of a restoration order and a civil penalty. The United States is authorized under 33 U.S.C. § 1319(b) to seek "appropriate relief, including a permanent or temporary injunction" for a CWA violation.  The Eighth Circuit addresses the propriety of injunctive relief by determining if a restoration order: (1) is designed to confer maximum environmental benefit, (2) is practical and feasible from an environmental and engineering standpoint, and (3) takes into consideration the financial resources of the defendant, and (4) includes consideration of defendant's objections. *Bailey*, 571 F.3d at 805.  The Court finds there are numerous factual issues regarding the maximum environmental benefit, the feasibility of a restoration order, and the financial resources of the defendant.

To determine an appropriate monetary penalty, the Court is instructed to consider "the seriousness of the violation or violations, the economic benefit (if any) resulting from the violation, any history of such violations, any good-faith efforts to comply with the applicable requirements, the economic impact of the penalty on the violator, and such other matters as justice may require."  33 U.S.C. § 1319(d).  The Court finds there are factual issues regarding these factors as well.  The Court will deny the United States' summary judgment motion for injunctive relief and monetary penalties.

The Court orders the parties to meet and confer concerning the United States' request for a restoration order and monetary penalties and file a joint letter with the Court within thirty days.  The Court anticipates scheduling an evidentiary hearing to resolve the

remedies issues unless the parties are satisfied with providing affidavits and briefs to the Court with an opportunity for oral argument.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that

1.     The United States' motion for summary judgment [Docket No. 49] is **GRANTED in part** and **DENIED in part**:

     a.     The motion is **GRANTED** as to Russ Huseby's liability.

     b.     The motion is **DENIED** in all other respects.

2.     The Husebys' motion for summary judgment [Docket No. 51] is **GRANTED in part** and **DENIED in part** as follows:

     a.     The motion is **GRANTED** with respect to defendant Brady Huseby.

     b.     The motion is **DENIED** in all other respects.


DATED:  March 2, 2012
at Minneapolis, Minnesota.

                              s/ John R. Tunheim
                               JOHN R. TUNHEIM
                       United States District Judge